# APPENDIX

Opinion of August 3, 2001
Criminal No. 99-0043
USA v. Jose Marquez

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        v.                          )        Criminal No. 99-0043 (PLF)
                                    )
JOSE MARQUEZ,                       )
                                    )
        Defendant.                  )
_____)


OPINION

This matter is before the Court on the motion of defendant Jose Marquez for a

new trial. After a trial lasting eight weeks and concluding on May 3, 2000, Mr. Marquez was

convicted of conspiracy to distribute narcotic drugs and acquitted of two other charges. Through

counsel appointed after trial, defendant filed a motion for a new trial based on his trial counsel's

asserted ineffective representation. Upon consideration of the arguments of the parties in their

briefs and at the motions hearing, the Court grants defendant's motion for a new trial.


I. BACKGROUND

Defendant Jose Marquez originally was indicted with six others on March 2,

1999; he went to trial on a superseding indictment returned on June 1, 1999. He was charged in

three counts of the nine-count indictment with: (1) conspiracy to distribute cocaine, cocaine base

and heroin, in violation of 21 U.S.C. § 846; (2) unlawful possession with the intent to distribute

100 grams or more of heroin and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and

(b)(1)(B)(i) and 18 U.S.C. § 2; and (3) unlawful possession with the intent to distribute heroin

within 1000 feet of a school and aiding and abetting, in violation of 21 U.S.C. § 860(a) and 18

U.S.C. § 2.  Mr. Marquez, along with two of his co-defendants and alleged co-conspirators, Pedro Agramonte and Jose Diplan, stood trial beginning on March 6, 2000.[1]

The two possession counts against Mr. Marquez arose out of the same series of events occurring on February 4, 1999.  Special Agent David Buckel of the Drug Enforcement Administration testified that he witnessed Mr. Marquez leave the El Pacifico pool hall along with Mr. Agramonte and Mr. Diplan.  See March 15, 2000 Trial Transcript ("3/15/00 Tr.") at 974-75, 981-82, 986-88.  After speaking with Mr. Agramonte and Mr. Diplan, Mr. Marquez walked over to a blue Oldsmobile that the agents knew had a secret compartment for the storage of drugs and had been used earlier that day to transport heroin.  The agents saw Mr. Marquez drive the car a short distance from the pool hall to an alley behind the apartment building where Mr. Agramonte and Mr. Diplan had allegedly cut and packaged the heroin that had been hidden in the car.  See id. at 976-80.  When he left the car, Mr. Marquez threw the car keys in the grass next to the apartment building; he was then arrested by DEA agents.  See id. at 980-86.  Special Agent David Crosby of the DEA was present when Mr. Marquez was arrested and testified that Mr. Marquez denied any knowledge of the blue Oldsmobile that he had just been seen driving.  See 3/7/00 Tr. at 251-52.

With respect to the conspiracy count, the evidence against Mr. Marquez consisted primarily of the testimony of two alleged co-conspirators who had pled guilty and had become witnesses for the government: Bertilio Jesus Soto Canales and former co-defendant Jose Ismael Medina-Torres.  Mr. Soto Canales's testimony concerned conversations between Mr. Marquez

---

[1]     Co-defendants Roger Ramirez, Jose Ismael Medina-Torres, and Miguel Romero all pled guilty and testified at the trial in this case.  Co-defendant Antonio DeJesus Alberto absconded from a halfway house before trial, but ultimately was captured and pled guilty.

2

and Henri Alberto, one of the alleged leaders of the conspiracy. Mr. Soto Canales claimed at different points in his testimony that he either heard these conversations directly or that they were related to him by Mr. Alberto. Mr. Medina-Torres testified to discussions that he had with Mr. Marquez in which -- according to Mr. Medina-Torres -- Mr. Marquez offered to sell him powder cocaine and revealed that these drugs belonged to Henri Alberto. Mr. Medina-Torres's testimony also concerned debriefings he had with the FBI and the DEA in which he discussed his conversations with Mr. Marquez.

On April 20, 2000, the Court considered and denied Mr. Marquez's motion for judgment of acquittal. See 4/20/00 Tr. at 3626-32. With respect to the two substantive counts, the Court concluded that there was sufficient albeit sparse evidence of the defendant's guilt. See id. at 3628. The Court found that there was less evidence against him on the conspiracy count, that this was a much closer call, but that there was still enough to permit the case to go to the jury. See id. at 3629-33. On May 3, 2000, the jury concluded its deliberations, finding Mr. Marquez guilty of the conspiracy charge but acquitting him on the two substantive counts.

On May 4, 2000, the day after the jury returned its verdict, the Court spoke with Mr. Marquez's trial counsel in Chambers to recommend that she file a motion for a new trial based on a claim that she had provided ineffective assistance of counsel at trial, telling her at the same time that she could no longer represent Mr. Marquez if he chose to argue ineffective assistance of counsel. See June 13, 2000 Status Conference Transcript ("Status Tr.") at 7-8. On May 8, 2000, defendant, through trial counsel, filed a motion for an extension of time to file a new trial motion on grounds of ineffective assistance of counsel and to request the appointment of new counsel to pursue the ineffective assistance claim. On May 10, 2000, Mr. Marquez, again

3

through trial counsel, filed an amended motion for an extension of time to file a new trial motion and a motion to set aside the verdict and for judgment of acquittal. Co-defendant Diplan filed a motion for a new trial on May 9, 2000, and co-defendant Agramonte filed a motion for a new trial on May 10, 2000. These two motions were denied by the Court in an opinion issued on July 12, 2000.

On May 23, 2000, the Court granted Mr. Marquez's motion for an extension of time *nunc pro tunc* to May 10, 2000, and appointed Edward Sussman as his new counsel. On June 2, 2000, the court of appeals issued a decision in United States v. Hall, 214 F.3d 175 (D.C. Cir. 2000), holding that the failure of a defendant to file a motion for a new trial within the seven-day period specified in Rule 33 of the Federal Rules of Criminal Procedure deprives the district court of jurisdiction to consider the new trial motion, *unless* within the seven days the defendant has filed a motion for an extension of time to file such a motion *and* the district court has acted on the motion for extension. That same day, the government filed a motion based on Hall, arguing that this Court had no authority to consider defendant's new trial motion. On June 13, 2000, the Court denied the government's motion.

II. JURISDICTION

Before reaching the merits of Mr. Marquez's new trial motion based on trial counsel's alleged ineffective assistance, the Court first must determine whether it has jurisdiction to decide the issue. In its opposition to Mr. Marquez's motion for a new trial, the government reiterates its contention that the Court lacks jurisdiction to grant defendant's motion because Mr. Marquez failed to file his motion for a new trial within seven days of the jury's verdict and

4

because this Court failed to act on his motion for an extension of time within the seven-day period. See Rule 33, Fed. R. Crim. P.; see also United States v. Hall, 214 F.3d 175, 178 (D.C. Cir. 2000). Relying on Hall, the government argues that Rule 33, as written, contains a clear and unambiguous deadline for filing a new trial motion or for the extension of that deadline, and Mr. Marquez's failure to file in time in the absence of this Court's granting an extension within seven days of the verdict deprives the Court of jurisdiction to consider the motion. The Court does not agree.

Rule 33 of the Federal Rules of Criminal Procedure provides that a motion for a new trial "may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7-day period." Rule 33, Fed. R. Crim. P. Although requiring strict adherence to the seven-day time period of Rule 33, the court of appeals in Hall did not completely foreclose the possibility that there might be certain instances when a defendant's failure to comply with Rule 33 may be excused. The court in Hall held that the failure to comply with the deadline for filing may be excused when there exists "the 'unique circumstances' that the cause of the failure to meet the Rule's deadline was an erroneous ruling or assurance by the District Court itself." United States v. Hall, 214 F.3d at 177 (quoting Carlisle v. United States, 517 U.S. 416, 428 (1996)). No "unique circumstances" were present in either Hall or Carlisle, but the Supreme Court found that such circumstances did exist in Thompson v. INS, 375 U.S. 384, 386-87 (1964), upon which the Court relied in Carlisle.

Thompson involved a motion for a new trial that was filed 12 days after the district court had denied a petition for United States citizenship. See Thompson v. INS, 375 U.S. at 385. Although the motion actually was filed two days late and should not have been

5

considered, the district court erroneously concluded that the motion was filed "in ample time." Id. When the district court denied petitioner's motion for a new trial, he filed a notice of appeal. See id. The court of appeals concluded that the motion for a new trial had been filed out of time and therefore did not toll the running of the 60-day period for filing a notice of appeal. See id. at 385-86. The court of appeals held that the time for an appeal began to run when the district court entered final judgment in the case and not when it denied the new trial motion. See id. The time in which to file a notice of appeal had long since expired, and the court of appeals therefore concluded that it could not consider petitioner's appeal and dismissed the case. See id.

The Supreme Court reversed, concluding that "unique circumstances" existed that excused petitioner's failure to file a timely notice of appeal. Thompson v. INS, 375 U.S. at 386. The Court in Thompson reasoned that petitioner had relied on the district court's express assurance that the new trial motion had been filed on time, thus tolling the time for filing a notice of appeal and preserving petitioner's right to appeal until 60 days after the court had ruled on the motion for new trial. See id. If the district court had not erroneously assured petitioner that his new trial motion was timely, he would have filed a notice of appeal within 60 days after the entry of judgment rather than waiting until the new trial motion was resolved. See id. at 386-87. On these facts, the Supreme Court concluded that petitioner lost his right to appeal because of the erroneous advice of the district court, not because of his or his lawyer's error, providing the kind of "unique circumstances" that allowed the court of appeals to exercise jurisdiction over the case. See id.

Similarly, Mr. Marquez's failure to file a timely motion for new trial is excused because of the erroneous advice he received from this Court. Immediately after the trial, the

6

Court instructed trial counsel to talk to her client promptly about raising the issue of her own ineffective assistance but advised her that she herself could not argue the motion or continue to represent Mr. Marquez if that issue was to be raised. See Status Tr. at 7-8. Because trial counsel could no longer represent the defendant, the Court contacted the Federal Public Defender to arrange for new counsel. See id. at 7. After talking to her client, defense counsel timely filed a motion for an extension of time and for appointment of new counsel and then an amended motion, both within seven days of the verdict; each motion requested additional time in which to file a new trial motion. In the motion, counsel stated that she believed that ineffective assistance of counsel might be asserted as a basis for a new trial and that she had discussed this possibility with her client and explained to him that she herself could not file a motion raising an ineffectiveness claim; a new lawyer would be required. In these circumstances and in light of the Court's instructions, all defense counsel could have done was to ask the Court for an extension of time while new counsel was obtained for the defendant.

At the June 9, 2000 status conference, the Court made clear that Mr. Marquez's failure to file a new trial motion within seven days of the verdict was attributable to the Court's error in not granting the motion for extension of time within those seven days while seeking new counsel, and not to any error on the part of trial counsel:

> I was in error. [Defense counsel] was not in error. I made the mistake. I wasted seven days. I called [defense counsel] in and spoke with her and urged her to raise an ineffective assistance of counsel [argument] and told her I had no idea how I would rule but in the interests of her client she had an obligation to raise the issue. She might win, she might lose. I told her she couldn't represent him if she raised that issue. She told me she had to talk with Mr. Marquez and his family and that was going to take some time. I called Mr. Kramer [the Federal Public Defender] and said we need

7

> a new lawyer, find somebody. [Defense counsel] timely filed her motion.
>
> These are the kinds of unique circumstances that the Supreme Court had in mind and that [Chief] Judge Edwards must have had in mind when he decided <u>Hall</u>.

Status Tr. at 7-8. The Court took "full responsibility" for Mr. Marquez's situation and explained that trial counsel was "as diligent as could be" in the circumstances. <u>Id.</u> at 8. Thus, under the Supreme Court's "unique circumstances" exception acknowledged in <u>Hall</u>, Mr. Marquez's failure to file a motion for a new trial within seven days is excusable because of the Court's error.

The court of appeals also stated in <u>Hall</u> that "there was no reason why Mr. Hall could not have filed a motion for a new trial within Rule 33's 7-day time limit." <u>United States v. Hall</u>, 214 F.3d at 178. In this case, there is a very good reason why Mr. Marquez could not have filed a motion for new trial; the Court instructed his lawyer that since the issue that Mr. Marquez would be raising in the new trial motion would be her own ineffective assistance of counsel, she could no longer represent Mr. Marquez. <u>See</u> Status Tr. at 7. Furthermore, because the Court had told trial counsel that she could no longer represent Mr. Marquez if he decided to raise this issue, Mr. Marquez effectively was unrepresented during this critical time when the Court was seeking new counsel for him. Because Mr. Marquez's attorney, unlike trial counsel in <u>Hall</u>, was unable to file a new trial motion during this period and because Mr. Marquez was in effect unrepresented when his right to seek a new trial purportedly expired, the Court finds that his failure to comply with the seven-day deadline of Rule 33 should be excused. The Court therefore has jurisdiction to decide his motion for new trial.[2]

---

[2] Mr. Marquez's May 10, 2000 motion for an extension of time in which to file a new trial motion, filed through his trial counsel, indicated that he would be raising an ineffective

8

Finally, even if defendant's failure to file his motion for new trial within seven days cannot be excused despite the Court's clear direction to trial counsel, the Court likely would conclude that her failure to file a new trial motion within seven days itself constituted ineffective assistance of counsel. The remedy therefore would be to allow Mr. Marquez to argue on collateral attack both that his trial counsel provided ineffective assistance of counsel at trial and during the seven-day period immediately after trial when she failed to file a new trial motion. To conclude that this Court had no jurisdiction to consider Mr. Marquez's motion for new trial would merely delay consideration of these issues that ultimately would be raised on collateral attack. Under the unique circumstances exception of <u>Hall</u> and for the additional reasons explained here, the Court concludes that Mr. Marquez's failure to file a new trial motion within seven days of the verdict may be excused and that the Court has jurisdiction to consider the motion on its merits.

### III.  MOTION FOR A NEW TRIAL: INEFFECTIVE ASSISTANCE OF COUNSEL

### A.  The Standard

Rule 33 of the Federal Rules of Criminal Procedure says only that the district court may grant a new trial to a defendant "if the interests of justice so require." Rule 33, Fed. R. Crim. P. In attempting to explain what Rule 33's "interests of justice" standard means, Professor

---

assistance of counsel argument, putting the government on notice regarding the basis for defendant's motion. Although the Court concludes that there are unique circumstances that excuse Mr. Marquez's late filing, in the alternative, the Court could construe the motion for an extension of time as a motion for a new trial, filed within seven days of the verdict, with a memorandum of points and authorities in support of the motion to follow after new counsel entered an appearance in the case.

Wright has said: "Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." 3 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 556 (2nd ed. 1982). A new trial should be granted only if the moving party has shown that "the error was substantial, not harmless, and that the error 'affected the defendant's substantial rights.'" United States v. Walker, 899 F. Supp. 14, 15 (D.D.C. 1995), aff'd, 99 F.3d 439 (D.C. Cir. 1996) (quoting United States v. Johnson, 769 F. Supp. 389, 395-96 (D.D.C. 1991)).[3] In the end, whether to grant a motion for a new trial is "a decision committed to the Court's sound discretion." United States v. Neill, 964 F. Supp. 438, 441 (D.D.C. 1997).

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. The Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), announced the standard that a defendant must meet to prevail on an ineffective assistance of counsel claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

---

[3] On a motion for a new trial based on newly discovered evidence, the court of appeals has held that a defendant can prevail only if he can show that "a new trial would *probably* produce an acquittal." United States v. Williams, 233 F.3d 592, 593 (D.C. Cir. 2000) (quoting Thompson v. United States, 188 F.2d 652, 653 (D.C. Cir. 1951)) (emphasis in original). Mr. Marquez's motion is not based on newly discovered evidence, so this same test does not apply. See 3 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 551 (2nd ed. 1982); see also Strickland v. Washington, 466 U.S. 668, 694 (1984). The question here is not whether a new trial will probably produce an acquittal but whether, but for trial counsel's deficiencies, there is a reasonable probability that the outcome of the first trial would have been different. See infra at 12.

Id. at 687.  Under the first part of the test, the defendant must show that counsel fell below an objective standard of reasonableness and under the second part, that the deficient performance prejudiced the defendant by depriving him of a fair trial.  See id. at 688; see also United States v. Bruce, 89 F.3d 886, 892 (D.C. Cir. 1996).  The "benchmark" for judging any claim of ineffectiveness is "whether's counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland v. Washington, 466 U.S. at 686.

Recognizing that it is "all too tempting" for a defendant to second-guess counsel's decisions made at trial, the Supreme Court has said that trial counsel is entitled to a substantial presumption that she acted within this objective standard of reasonableness.  Strickland v. Washington, 466 U.S. at 689-90.  Because a court must assume that there is a wide range of sound trial strategy that a constitutionally effective attorney might choose, it is up to the defendant to overcome this presumption and show that the challenged action was not the result of sound trial strategy.  See id.  Even if trial counsel's errors are substantial and objectively unreasonable, a defendant still must make an affirmative showing of prejudice.  See id. at 692-93.  Under the Strickland test:

> The defendant must show that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different.  A reasonable probability is
> a probability sufficient to undermine confidence in the outcome.

Id. at 694.  "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilty."  Id. at 695.

### B.  Cross-Examination of Government Witness Bertilio Jesus Soto Canales

11

Bertilio Jesus Soto Canales, a co-conspirator cooperating with the government, had no knowledge of the events of February 4, 1999, and spent most of his two days on the witness stand testifying about his drug activities with Henri Alberto, Antonio Alberto, Pedro Agramonte, Roger Ramirez and Jose Ismael Medina-Torres.[4] Near the end of his direct testimony, he testified that he knew Mr. Marquez and had met him at the El Pacifico pool hall located next door to the grocery store run by Mr. Marquez's mother-in-law. See 3/21/00 Tr. at 1410. During the government's direct examination of Mr. Soto Canales, there were two statements admitted regarding Mr. Marquez's alleged involvement in the charged drug conspiracy: (1) a statement allegedly made to Mr. Soto Canales by Henri Alberto in which Mr. Alberto told the witness that Mr. Marquez had come to Mr. Alberto's apartment to get drugs (the statement in the apartment), and (2) Mr. Soto Canales's grand jury testimony in which he testified that he actually witnessed Mr. Alberto give drugs to Mr. Marquez in the apartment; Mr. Soto Canales recanted this testimony at trial. Defendant argues that trial counsel's errors in dealing with these statements allowed a third, much more damaging statement to be admitted in which Mr. Soto Canales claimed personally to have heard Mr. Marquez ask Mr. Alberto for drugs and claimed that (in response) Mr. Alberto told Marquez to come to the apartment in about an hour. This third statement allegedly was made on the street outside the El Pacifico pool hall (the statement on the street).

Mr. Marquez argues that trial counsel's errors in eliciting this testimony constitute ineffective assistance because they resulted from counsel's (1) lack of familiarity with the

---

[4]     Mr. Soto Canales was indicated and entered a guilty plea before Judge Richard W. Roberts in United States v. Martinez, Criminal No. 98-0443 (D.D.C.).

12

discovery she had received in the case, and (2) her overly aggressive objections and ill-conceived questions on cross-examination -- actions that cannot be attributed to reasonable strategic judgments. Furthermore, he argues that these errors opened the door to additional inculpatory evidence against Mr. Marquez that otherwise would not have been admitted and allowed Mr. Soto Canales the opportunity to reconcile the inconsistencies between his grand jury testimony and his testimony at trial.

After identifying Mr. Marquez in court and explaining how he met him, Mr. Soto Canales began describing two occasions when he, Mr. Alberto, Mr. Agramonte and Mr. Marquez were outside the pool hall in a car. See 3/21/00 Tr. at 1410-12. When trial counsel objected to the introduction of any testimony about discussions among the four of them as hearsay, the Court asked for a proffer as to what Mr. Soto Canales would say about the conversations. See id. at 1413. The prosecutor wasn't sure what the witness would say, responding: "I guess he could give one of two or three responses. He may respond to something incriminating. He may have an innocent response to that particular question." Id. The prosecutor then proffered, however, that he thought that Mr. Soto Canales would testify that he actually saw Mr. Alberto give Mr. Marquez drugs. See id. at 1412-13. Defense counsel responded that she was unaware of any such testimony, that "[t]his is totally new" to her, and that she was "totally taken . . . by surprise." Id. at 1413. The prosecutor promptly pointed out that Mr. Soto Canales had testified before the grand jury that he saw Mr. Alberto give Mr. Marquez drugs and that there had been conversations about this transaction; and he argued that any testimony about such conversations would be admissible under the co-conspirator exception to the hearsay rule. After the Court asked the prosecutor to show defense counsel the grand jury testimony to which he alluded, she

13

then acknowledged the accuracy of the prosecutor's proffer, explaining that she simply had missed that portion of the grand jury transcript. See id. at 1414-15.

Resuming his direct testimony, Mr. Soto Canales described a meeting that took place between Mr. Alberto and Mr. Marquez while he and Mr. Agramonte remained in a car parked outside of the El Pacifico pool hall:[5]

> Q. While the four of you were together, did anybody mention drugs?
>
> A. Chino took Henri out of the car, and they went to talk together.
>
> Q. Were you able to overhear what they said?
>
> A. No. Then they would come back to the car.
>
> Q. What happened after they came back to the car.
>
> A. Well, sometimes they would say--they would tell us--tell me and Cuba to get out of the car, and then they would get in the car.
>
> Q. Do you know what would happen then?
>
> [DEFENSE COUNSEL]: Objection, speculation.
>
> THE COURT: Do you know what happened after you got out of the car from your own personal knowledge?
>
> THE WITNESS: Just Henri said that they had drugs, that's all.
>
> MR. BLACK [the prosecutor]: Who had drugs?
>
> INTERPRETER: Could the witness be asked to repeat the question asks the interpreter?

---

[5] During the trial, Mr. Marquez and others allegedly involved in the conspiracy were often referred to by the their nicknames. Mr. Marquez was also known as "El Chino" or "Chino," Mr. Agramonte as "Cuba," and Mr. Alberto as "El Cojo."

THE COURT: You want him to repeat the question or him to repeat the--

INTERPRETER: The answer.

THE COURT: Yes.

[DEFENSE COUNSEL]: Same objection, Your Honor.

THE COURT: I think you better come to the bench.

Id. at 3/21/00 Tr. 1416-17. At the bench, the government proffered that if Mr. Soto Canales was not about to testify that he had seen a transfer of drugs to Mr. Marquez, he would at least testify that Mr. Alberto told him that he (Mr. Alberto) gave drugs to Mr. Marquez and that this statement therefore was admissible under the co-conspirator exception to the hearsay rule as a statement in furtherance of the conspiracy. See id. at 1417-20. The Court rejected the government's argument and excluded the statement. See id. at 1421-24.

After the bench conference, the prosecutor asked the witness if he ever actually saw Mr. Alberto give Mr. Marquez drugs and Mr. Soto Canales said that he had not. See 3/21/00 Tr. at 1425. The prosecutor then read a portion of Mr. Soto Canales's grand jury testimony in which Mr. Soto Canales testified that he had witnessed Mr. Alberto give drugs to Mr. Marquez. See id. at 1425-27. Mr. Soto Canales conceded that he had so testified in the grand jury, but he recanted his grand jury testimony, explaining that Mr. Marquez had come to Mr. Alberto's apartment, that Mr. Marquez and Mr. Alberto had gone into another room where Mr. Soto Canales could not see or hear them, and that after Mr. Marquez left Mr. Alberto had told Mr. Soto Canales that he had given Mr. Marquez drugs, but that he (Mr. Soto Canales) had not

15

actually seen any drug transaction.  See Tr. 1426-27.  Trial counsel objected to the Alberto

statement as hearsay.  See id. at 1427.

At the end of the day, outside the presence of Mr. Soto Canales and the jury, the

Court revisited defense counsel's objection regarding the alleged conversation in Mr. Alberto's

apartment.  The Court summarized the situation:

> THE COURT:  Mr. Soto Canales was going to say that when he
> was in the car with Mr. Marquez, Mr. Agramonte and Henri
> Alberto that Mr. Henri--I'm sorry, Henri Alberto said that Mr.
> Marquez--I'm sorry.
>
> That Henri Alberto said that he gave drugs to Mr. Marquez, and I
> said at that point that I do not think that there was a sufficient
> connection to the conspiracy or that this was a statement in
> furtherance of the conspiracy, and that it would be very prejudicial.
> And obviously with coconspirator statements, the Court has a
> balancing test to conduct under Rule 403.
>
> So Mr. Black decided instead based on what was in the grand jury
> testimony in which Mr. Soto Canales said that he saw Mr. Henri
> give Mr. Marquez drugs in the house, and based on--in the
> apartment, and based on Mr. Black's understanding that it may not
> have occurred in the apartment but actually occurred in the car, Mr.
> Black in good faith asked the question about whether he ever saw
> Mr. Henri Alberto give drugs to Mr. Marquez in the car or outside
> the pool hall or whatever.
>
> Mr. Soto Canales said no, that he never saw Henri Alberto give
> drugs to Mr. Marquez.  At that point Mr. Black decided to impeach
> [the witness.]
>
> *     *     *
>
> Rule 607 says that the credibility of a witness may be attacked by
> any party including the party calling the witness, and that's changed
> from the common law.  So Mr. Black could impeach Mr. Soto
> Canales with his grand jury testimony, which he did.

16

Mr. Soto Canales then said inconsistently with his grand jury testimony that he never personally--the grand jury testimony said that Soto Canales saw Henri give drugs to Marquez at the apartment.

Mr. Soto Canales said today in Court that he did not personally see Henri Alberto give drugs to Mr. Marquez at the time [sic] apartment, which is inconsistent with the grand jury testimony.

In the course of saying that, he also said that Henri Alberto said to Soto Canales that he gave drugs to Mr. Marquez and that's what Mr. Marquez had come for.

Now that's Mr. Soto Canales' explanation of his grand jury testimony. So he denies that he ever saw Mr. Henri Alberto give drugs to Mr. Marquez. Mr. Black attempts to impeach him with the grand jury testimony on that issue. Then he explains that what he meant was that he never saw it even though he said it in the grand jury but that Mr. Henri Alberto told him.

*The reason I'm going through all this is because I think that defense counsel has to decide whether she wants to persist in her argument about whether this statements [sic] shouldn't come in.*

Because under 801(d)(1)(A), when a witness testifies at trial and is subject to cross-examination concerning an out-of-court statement and the statement is inconsistent, the out-of-court statement is inconsistent with the trial testimony and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, then it comes in as substantive evidence.

The prior statement comes in as substantive evidence, and it does not matter that the prior under oath testimony was not subject to cross-examination, and there are cases that say that grand jury testimony is "another proceeding" under 801(d)(1)(A).

So if Mr. Black chooses to introduce the grand jury testimony as substantive evidence, it will come in as Mr. Soto Canales' testimony that he saw, he personally saw this event occur at the apartment.

Now clearly he said something different here today, and the jury will have to decide whether to believe his prior statement or the

17

testimony in court, but both would be considered under 801(d)(1)(A) as substantive evidence.

*So then we get to what is the explanation for the grand jury testimony. The explanation [that Mr. Soto Canales gave today] helps the defense, not the government. The explanation is oh, I didn't really see it; Mr. Henri Alberto told me about it.*

*So it might be in [defense counsel's] interest to have what she believes is hearsay come in.* And as we all know, hearsay is not automatically excludable. Hearsay is only excludable if it's objected to. So if she doesn't want to object to it, it will come in because it may be helpful.

If on the other hand, she does want to object to it, she may preserve that objection, and then I'll decide whether it comes in anyway under the coconspirator exception to the hearsay rule.

But I wanted to put all of that on the record. If you all disagree with that analysis, you can tell me you disagree with that analysis. It seems to me that the grand jury testimony is going to come in as substantive evidence, and that therefore [defense counsel] may find it in her interest to permit what she believes is hearsay. The government doesn't agree that it's hearsay.

*She believes it's hearsay [but it may be helpful to the defense for it] to come in so that we have an explanation for Soto Canales' testimony. Namely, I didn't see it; Henri Alberto only told me about it and therefore it's not worth very much on* [sic] *the defense view.*

*So you have a tactical judgment to make as to whether you want to object to this statement, not the one that I already ruled on about what may or may not have been said at the car or outside the pool hall, but this one that came in now about what was allegedly said at the apartment, which you have now asked me to strike, . . . .*

*So if you want me to strike it, you can renew your objection and ask me to strike it. If you want to withdraw your objection because having it in before the jury may actually be helpful because it's less damming than the grand jury testimony, which will come in as substantive evidence.*

18

Then I'll decide. If you want to preserve your objection, we'll move on to the next question whether it's admissible as a coconspirator exception statement. So if I'm clear, you can think about it and let me know what you want to do. Everybody understand what I said?

[DEFENSE COUNSEL]: Can I have a little bit of time to think about it?

THE COURT: Sure.

[DEFENSE COUNSEL]: Can I let you know tomorrow morning when we come in?

THE COURT: Yeah. . . .

\* \* \*

THE COURT: So think about it overnight. If you want to withdraw your objection and your request to strike, fine. If you want to preserve it--and you understand my point?

[DEFENSE COUNSEL]: Yes, I do. I do understand.

THE COURT: If you want to preserve it, then both you and Mr. Black have to think a little more about whether it comes in as a coconspirator exception. *In other words, if you're really trying to keep it out, then we have to deal with this question of whether in all of the circumstances it comes in as a statement in furtherance of a conspiracy.*

[DEFENSE COUNSEL]: Okay.

3/21/00 Tr. at 1450-56 (emphasis added).

The next morning, the interpreter from the previous day, Ms. Shelley Lorenzana, explained to the Court that when Mr. Soto Canales was testifying about the statement on the street, she was unable to understand the witness's answer. Before she could clarify the answer

19

with the witness and provide a translation, defense counsel objected, spawning a lengthy bench conference:

> THE COURT: Why don't you come back up here Ms. Lorenzana. Maybe if you give Ms. Montgomery the transcript for a second, I will refresh my recollection, and I'll ask a question.
>
> I'm beginning on 1416. The question was, (reading):
>
>> "Q. What happened after they came back to the car?
>>
>> "A. Well, sometimes they would say--they would tell us--tell me and Cuba to get out of the car, and then they would get in the car.
>>
>> "Q. Do you know what would happen then?"
>>
>> "[Defense counsel]: Objection, speculation."
>
> Then I asked a question. I asked, (reading):
>
>> "Do you know what happened after you got out of the car from your own personal knowledge?"
>>
>> "The Witness: Just Henri said that they had drugs. That's all.
>>
>> "Mr. Black: Who had drugs?"
>
> Then Ms. Lorenzana said, (reading):
>
>> "Could the witness be asked to repeat the question asks the interpreter?"
>
> And I said, (reading):
>
>> "You want him to repeat the question or him to repeat the–
>>
>> "Ms. Lorenzana: The answer."

20

I said, "yes." (Reading):

> "[Defense counsel]: Same objection, Your Honor."

I said, "I think you better come to the bench."

We came to the bench. So he began to say something which you never got a chance to translate.

MS. LORENZANA: He actually said something, and I didn't quite understand him. I asked him to repeat it, and before I was able to interpret what he said, there was an objection.

THE COURT: Do you know now what--

MS. LORENZANA: I believe I do, Your Honor. He said, "After he came back, Chino said to him Henri, do you have drugs?"

3/22/00 Tr. at 1484-85. This clarification suggested that if permitted to answer the question, Mr. Soto Canales would have said that Mr. Alberto had told Mr. Soto Canales that he (Mr. Alberto) had given drugs to Mr. Marquez but that Mr. Soto Canales had personally seen no such transaction. See 3/21/00 Tr. at 1418-20.

The Court then turned its attention back to defense counsel's objection to the statement in the apartment and her motion to strike it:

> But nevertheless, [defense counsel] might want to waive [her objection] and have [the statement in the apartment] admitted because [it] might actually undercut the grand jury testimony that Mr. Soto Canales saw Henri and Mr. Marquez engage in the [drug transaction].
>
> So [defense counsel], I think the ball is in your court first as to what you want to say with respect to the statement attributed to Henri at the apartment, and then we can take it from there with respect to these statements [in the street] if we need to.

21

3/22/00 Tr. at 1488.  Trial counsel maintained her hearsay objection, and the Court therefore allowed further argument on the admissibility of the statement in the apartment under exceptions to the hearsay rule.  The government argued that the statement in the apartment should be admitted either as a statement of a co-conspirator or as a statement against penal interest.  See id. at 1488-89.  The Court ruled that the statement could come in under the second theory.  See id. at 1493-95.

In light of the interpreter's earlier clarification, the government also argued that the statement on the street should be admitted against Mr. Marquez as a statement against penal interest.  See 3/22/00 Tr. at 1489-90.  Admitting the statement under this exception depended in part on whether Mr. Soto Canales actually heard Mr. Marquez ask for drugs or whether the conversation was related to him second-hand.  See id. at 1490.  The interpreter believed that Mr. Soto Canales testified that he himself had heard Mr. Marquez's statement on the street.  Id. at 1490-91.  The Court therefore ruled that after defense counsel completed her cross-examination, the prosecutor could *voir dire* the witness outside the presence of the jury to see if he could establish a foundation for admission of the testimony.  See id. at 1491-92.

Defense counsel's cross-examination of Mr. Soto Canales made the *voir dire* unnecessary:

> Q.  Okay.  Now you never saw Mr. Marquez and Henri exchange any drugs, did you?
>
> A.  I never did, but they spoke–
>
> Q.  My question requires a yes or no answer.
>
> MR. BLACK:  I'm going to object, Your Honor, and ask that the witness be allowed to finish his answer.

22

THE COURT: You'll have redirect.

BY [DEFENSE COUNSEL]:

Q. And in your presence, you never heard Mr. Marquez discuss drugs with Henri; isn't that correct?

A. Yes, I heard.

3/22/00 Tr. at 1505. The Court ruled that, in view of this testimony, the foundation that the government needed to establish for additional questions had been provided by defense counsel's cross-examination of Mr. Soto Canales and that she had opened the door to the government's redirect concerning the substance of the statement Mr. Soto Canales said he had heard.

On redirect, Mr. Soto Canales testified that he was present and actually heard Mr. Marquez ask Mr. Alberto if Mr. Alberto had drugs when they were in the car on the street and that he heard Mr. Alberto tell Mr. Marquez to come back to the apartment in about an hour. See 3/22/00 Tr. at 1574-78. He further testified that when Mr. Marquez arrived at the apartment, he went into the bedroom with Mr. Alberto. After Mr. Marquez left, Mr. Alberto told the witness that he had given Mr. Marquez the drugs that Mr. Marquez had asked about on the street outside of the pool hall. See id.

Defense counsel's handling of this witness fell below an objective standard of reasonableness and constitutes ineffective assistance of counsel. Her early objections demonstrated that she had not thoroughly read or had simply forgotten a crucial part of Mr. Soto Canales's grand jury testimony produced during discovery, especially the evidence directly implicating Mr. Marquez. It cannot be a reasonable trial strategy to fail to review significant inculpatory evidence against one's own client, particularly when there is not a great deal of

23

evidence against him in the first place. It is ineffective assistance of counsel not at least to have a working knowledge of such a crucial witness' prior statements. See United States ex rel. Williams v. Brown, 721 F.2d 1115, 1120 (7th Cir. 1983).

Defense counsel's hearsay objection to the statement allegedly made by Henri Alberto in the apartment illustrates her tendency to make decisions that have not been carefully thought out and entail few benefits and significant and unreasonable risks. Although her objection and her motion to strike the "hearsay" statement in the apartment may have seemed reasonable to counsel at first, the Court could not have been clearer in explaining how the statement to which she was objecting was probably more helpful to the defendant than to the government because it directly contradicted the witness's grand jury testimony inculpating the defendant. See 3/21/00 Tr. at 1452-55. If the jury was going to be permitted to consider Mr. Soto Canales's grand jury testimony as substantive evidence anyway ("I saw Mr. Alberto give Mr. Marquez drugs," see id. at 1426-27), shouldn't it also consider the fact that Mr. Soto Canales recanted that testimony and now testified at trial that he did not see any drug transaction in the apartment but only heard second-hand from Mr. Alberto about the purported drug transaction with Mr. Marquez? Even after thinking about the matter overnight, trial counsel concluded instead that she wanted this helpful "hearsay" testimony excluded. This was not a legitimate strategic decision on any theory but a serious blunder that had devastating and foreseeable consequences. See Government of the Virgin Islands v. Weatherwax, 20 F.3d 572, 579 (3d Cir. 1994); Ward v. United States, 995 F.2d 1317, 1322 (6th Cir. 1993).

The Court had advised trial counsel that if she persisted in making the hearsay objection, the helpful statement would not necessarily be excluded. Rather, the government

24

would be permitted to suggest various hearsay exceptions as alternative bases for admission of the statement that might then lead the Court to reconsider its decision to exclude the statement on the street. See 3/21/00 Tr. at 1454-56. It was clear to the Court -- although apparently not to defense counsel -- that the statement on the street that had been excluded and the statement in the apartment were related in the factual context of the case and raised related evidentiary issues, as the Court repeatedly told her on the record. But she appreciated neither the significance of these relationships nor the fact that once the government had time to review other hearsay exceptions besides the one the Court already had rejected, the Court might be persuaded that the previously excluded statement on the street was admissible on some other theory -- and that was exactly what happened. A competent lawyer would have backed off, accepted the Court's helpful suggestion with respect to what happened in the apartment and recognized the value of freezing the record exactly where it was after direct examination with respect to what happened on the street -- namely, that the witness already had testified before the jury that he actually did *not* hear Mr. Marquez say anything on the street outside of the pool hall. See 3/21/00 Tr. at 1416.[6]

Despite the magnitude of these errors, trial counsel's most significant mistake came during her cross-examination of Mr. Soto Canales. With the Court's limited evidentiary ruling concerning the statement in the apartment fresh in mind -- that it would be admitted as a statement against penal interest -- trial counsel should have realized that her questions needed to

---

[6]     Although all counsel were receiving daily copy of the transcripts, it appears that Mr. Marquez's attorney did not review the transcript for March 21, 2000 because the next morning when the Court heard argument on her objection, she seemed unfamiliar with significant portions of Mr. Soto Canales's testimony on direct examination from the previous day. See 3/22/00 Tr. at 1489-96. Her failure to prepare adequately falls below an objective standard of competence and is all the more inexcusable because she was the one who asked the Court for time to weigh her options overnight and presumably to prepare for argument on this issue.

steer the witness away from any discussion of the statement on the street and specifically away from anything he may have heard Mr. Marquez say. Instead, when dealing with a witness who had already demonstrated his unpredictability, trial counsel asked a question on cross-examination that allowed the witness to back away from his earlier testimony that all of the conversations on the street between Mr. Marquez and Mr. Alberto occurred out of Mr. Soto Canales's hearing and to testify instead that he personally heard Mr. Marquez ask Mr. Alberto for drugs. She asked: "And in your presence, you never heard Mr. Marquez discuss drugs with Henri; isn't that correct?" 3/22/00 Tr. at 1505. And the answer was, "Yes, I heard." Id. Trial counsel should not have been surprised by this answer because the witness had begun to give the same answer in response to a dangerously open-ended question she had posed only seconds earlier. See id. The testimony elicited by trial counsel seriously harmed her client and ultimately led the Court to reconsider its decision that the statement on the street was inadmissible.

Remarkably, trial counsel appeared suddenly to be fully aware of what she had just done, indicating that she herself facilitated what the government might have attempted to do on redirect by laying a non-hearsay foundation for further testimony. As she herself acknowledged:

> [DEFENSE COUNSEL]: I thought given my cross-examination
> that [the voir dire of Soto Canales] was going to probably be
> unnecessary since he essentially said what I think the government
> wanted him to say.
>
> *   *   *
>
> [DEFENSE COUNSEL]: I figured that I had accomplished what
> the government was going to do if we had had that [*voir dire* of
> Soto Canales].

> THE COURT: I think that . . . since you . . . elicited that on cross, although you probably, I'm sure, wished you hadn't, it did come out, that it is a legitimate ground for redirect. You said on cross that, and you can follow up.
>
> I think . . . the door has been opened. I think you [the prosecutor] can ask it. Whether he says the same thing on redirect or whether he says something different, we don't know. I think the door has been opened to ask the question.

3/22/00 Tr. at 1573-74. Opening the door to such harmful testimony unquestionably constitutes constitutionally ineffective representation. See Moore v. Johnson, 194 F.3d 586, 611-12 (5th Cir. 1999); Ward v. United States, 995 F.2d at 1322. Rather than putting the government to its burden of proof and seeking to raise a reasonable doubt in the minds of the jurors, defense counsel helped the government prove its case against Mr. Marquez -- which is clearly outside the range of choices competent counsel can make. See Moore v. Johnson, 194 F.3d at 612.

The government argues that even if trial counsel's representation of her client fell below an objective standard of reasonableness, Mr. Marquez cannot show prejudice because on redirect the statement Mr. Soto Canales said he heard Mr. Marquez make on the street would have been admitted anyway. The government suggests that the Court reconsidered its ruling to exclude the statement on the street because of the interpreter's explanation that she was not permitted to translate the witness's answer before the bench conference took place. The government notes that the decision to allow the prosecutor to *voir dire* the witness to determine whether he personally heard Mr. Marquez ask for drugs was the result of what the interpreter said and not the result of trial counsel's actions. Thus, when defense counsel opened the door on cross-examination to the government's redirect, there was no prejudice; the *voir dire* would have

27

occurred anyway and Mr. Soto Canales's answers would have been the same during *voir dire* and on redirect as they were on cross-examination.

Clearly, trial counsel's conduct had no effect on the interpreter's decision to inform the Court of the difficulties she encountered in translating Mr. Soto Canales's testimony. But that is irrelevant. The catalyst for the *voir dire* occurred during argument on defense counsel's objection to the statement in the apartment on hearsay grounds. Without trial counsel's objection, there would have been no argument concerning the admission of the statement as a statement against penal interest and thus no suggestion that the already excluded statement on the street could be admitted on the same basis. Even if the government had made this argument after the interpreter's clarification, the Court would have been much less inclined to revisit its earlier ruling, especially if defense counsel pointed out that the witness already had testified that he did not hear anything Mr. Marquez and Mr. Alberto had said to each other on the street. Defense counsel's poor preparation and an inappropriately aggressive strategy proved extremely damaging to Mr. Marquez. Her conduct enabled the government to bring before the jury additional damaging evidence implicating Mr. Marquez in the conspiracy. It gave the witness the chance to present a plausible account of Mr. Marquez's involvement in the conspiracy by reconciling his testimony about what happened and was said on the street and in the apartment and at the same time boosting his own credibility as a witness.

Assuming that the *voir dire* would have occurred regardless of defense counsel's actions, the Court simply cannot assume that Mr. Soto Canales's answers during a *voir dire* would have been the same as the answers defense counsel elicited on cross-examination. Mr. Soto Canales was an unreliable and easily suggestible witness who had already contradicted his

28

earlier sworn testimony in the grand jury and at trial testified inconsistently from the first day to the second day of his testimony.[7] In light of this witness's serious credibility problems and taking into account the numerous errors made by defense counsel along the way, the Court cannot find that Mr Marquez was not prejudiced by his lawyer's conduct -- especially when such a finding would have to be based on speculation as to how Mr. Soto Canales would have testified if the *voir dire* had taken place. While it is impossible to know what Mr. Soto Canales might have said on *voir dire*, it is abundantly clear that his actual testimony was extremely harmful to Mr. Marquez and was the direct result of defense counsel's numerous errors.

Finally, the government argues that even if this testimony was admitted only because of trial counsel's deficient performance, the additional damaging testimony was only minimally harmful to the defendant and therefore cannot undermine the integrity of the outcome of the trial. Quite the contrary: The Court's recollection of these events, in the overall context of the trial and as reflected in the transcript, is that Mr. Soto Canales's testimony on direct examination was not particularly credible -- either he was untruthful in the grand jury or at trial -- and the account of Mr. Marquez's actions was confusing and incomplete. Through her cross-examination defense counsel elicited damaging testimony that was not then before the jury, allowed the witness to reconcile his recanted grand jury testimony and trial testimony, and put in context what happened on the street and what happened in the apartment an hour later. Because

---

[7]    Compare 3/21/00 Tr. at 1416 (testifying that he could not hear Mr. Marquez and Mr. Alberto's conversation outside of the pool hall) with 3/22/00 Tr. at 1505; 1575-77 (testifying that he did hear Mr. Marquez and Mr. Alberto's conversation outside of the pool hall). In a bench conference during direct examination, the prosecutor himself acknowledged that Mr. Soto Canales might testify differently at trial than he did at the grand jury, indicating that he was unsure of what his own witness might say. See 3/21/00 Tr. at 1412-14.

29

of her conduct, the jury now had a focused, coherent picture of a drug transaction between Mr. Alberto and Mr. Marquez that began on the street and was consummated in the apartment with Mr. Soto Canales as a witness. Before defense counsel's cross-examination, the prosecutor had no confidence that Mr. Soto Canales would testify the way he ultimately did (see supra at 13-14), or else he would have asked the questions himself on direct that defense counsel asked on cross and -- after she opened the door -- the prosecutor asked on redirect. The direct testimony of Mr. Soto Canales would have been of little value without the government's redirect, and the redirect would have taken a different tack and been much more limited without defense counsel's ill-conceived cross-examination that traversed avenues better left untraveled and opened numerous doors along the way. Mr. Marquez was unquestionably prejudiced by his counsel's deficient performance. Strickland v. Washington, 466 U.S. at 686-87; see Moore v. Johnson, 199 F.3d at 620.

### C. Cross-Examination of Government Witness Jose Ismael Medina-Torres

Trial counsel's cross-examination of the government's other key witness against her client, Jose Ismael Medina-Torres, also was constitutionally deficient and prejudiced Mr. Marquez.

On direct examination, Mr. Medina-Torres identified Mr. Marquez in court and stated that the defendant associated with Mr. Agramonte and Mr. Alberto -- alleged higher-ups in the drug conspiracy -- and that Mr. Marquez was with Mr. Henri Alberto and Mr. Agramonte when Alberto and Agramonte came to Mr. Medina-Torres's house to collect some money Mr. Medina-Torres owed Mr. Alberto. See 4/4/00 Tr. at 2317-20. The witness testified that Mr.

30

Marquez waited by the car, did not come into the house, said nothing, and apparently did not hear the conversation between Mr. Agramonte and Mr. Medina-Torres. See id. at 2320-22. The witness also stated that the defendant was known as El Chino, which is how he referred to Mr. Marquez. See id. at 2345-46.

Mr. Medina-Torres then testified about a conversation with Mr. Marquez at a bar called Mamasan's where Mr. Medina-Torres asked Mr. Marquez if he could sell him 62 grams of powder cocaine; Mr. Marquez said he could but, Medina-Torres testified, no sale actually occurred. See 4/4/00 Tr. at 2345-47. The witness also testified that the two met a second time at Mamasan's and that he again asked Mr. Marquez if he could sell him powder cocaine, but again no sale took place. See id. at 2346-47. At that second meeting, according to the witness, Mr. Marquez stated that the drugs he could provide belonged to El Cojo (Henri Alberto). See id. at 2347.

Defense counsel's cross-examination of Mr. Medina-Torres began well enough as she attacked the witness's credibility -- his primary vulnerability. She highlighted the fact that during the time Mr. Medina-Torres worked with the FBI as an informer, he was actively selling drugs. See 4/4/00 Tr. at 2375-78. Trial counsel was able not only to demonstrate that the witness concealed his drug-dealing activities from his FBI contacts but also to elicit an admission from the witness that he had lied to the FBI about these activities. See id. at 2377. Defense counsel's cross-examination also revealed that the witness worked as a pimp in brothels in the District Columbia and in Maryland and that, in connection with these activities, Mr. Medina-Torres had bribed police officers. See id. at 2369-70. Finally, she made it clear to the jury that

31

the witness was testifying pursuant to a plea agreement in which cooperation with the government would likely reduce his own sentence quite substantially. See id. at 2381-82. In these portions of her cross-examination, defense counsel was able to demonstrate that the witness was unreliable and untruthful and willing to say what the government wanted to hear in order to benefit himself -- clearly effective representation of her client.

But then defense counsel asked a series of questions in which she tried to demonstrate that the witness had never mentioned Mr. Marquez and the conversations at Mamasan's to the FBI during his debriefings, presumably in order to show that the trial testimony of Mr. Medina-Torres was a recent fabrication or otherwise not credible:

> Q. Now in exchange for the money that was provided to you by the FBI, you spoke to Agent McGinty on at least eight separate occasions; isn't that correct?
>
> A. Correct.
>
> Q. And every time you spoke with Agent McGinty, he wrote down what you were saying, didn't he?
>
> A. Correct.
>
> Q. And you never mentioned Jose Marquez to Agent McGinty, did you?
>
> A. Well, I knew him not by his name but by El Chino.
>
> Q. My question was you never mentioned him to Agent McGinty, did you?
>
> A. Yes, I mentioned him.
>
> Q. And he wrote down everything [you] said, didn't he?
>
> A. Correct.

32

Q. But you did not mention Chino to Agent McGinty, did you?

A. Correct. I did mention him.

Q. Now after your arrest, you were debriefed by the agents on March 8th and March 18th; isn't that correct?

A. Correct.

Q. And they wrote down everything you said, too, didn't they?

A. Correct.

Q. And you never said anything to them about this 62 grams of cocaine that you offered to buy from Mr. Marquez; isn't that correct?

A. Correct.

4/4/00 Tr. at 2378-79.

Because of this cross-examination, the Court permitted the prosecutor to ask Mr. Medina-Torres on redirect examination about his debriefings with both FBI Agent Michael McGinty and agents of the DEA. The prosecutor elicited testimony in which the witness explained that in a debriefing with Agent McGinty (later established to have occurred on July 16, 1998, see 4/5/00 Tr. at 2500-01), Mr. Medina-Torres had indeed mentioned someone named Chino. See 4/5/00 Tr. at 2480. The prosecutor also established through Mr. Medina-Torres that when defense counsel asked the witness about being "debriefed by the agents on March 8th and March 18th," those debriefings were with DEA agents and not with FBI Agent McGinty. 4/4/00 Tr. at 2379. Over defense counsel's objection, the prosecutor also established on redirect that the witness had told these DEA agents on March 8 and March 18, 1999 about both meetings at Mamasan's, Mr. Marquez's offer to sell powder cocaine to Mr. Medina-Torres at both of those

33

meetings, and the statement at the second meeting that the cocaine belonged to Henri Alberto. See 4/5/00 Tr. at 2472-80. The prosecutor also elicited testimony on redirect that at the March 18, 1999 debriefing with the DEA, Mr. Medina-Torres viewed a photo spread containing Mr. Marquez's picture; above this picture the witness wrote his name and the date of the debriefing and below the picture he wrote "El Chino." See id. at 2467-72. Finally, the prosecutor clarified on redirect that the person Mr. Medina-Torres identified as "El Chino" to Agent McGinty and in the DEA photo spread and the person with whom he discussed the purchase of 62 grams of powder cocaine in fact was the defendant, Jose Marquez. See id. at 2472.

Several days later, the government called Agent McGinty as a witness. After refreshing his recollection with an FBI 302 report that he had prepared, Agent McGinty testified that during the July 16, 1998 debriefing, Mr. Medina-Torres mentioned a Hispanic male named Chino while discussing his own drug dealing activities. See 4/11/00 Tr. at 3030. Agent McGinty went on to state that over the course of several debriefings Mr. Medina-Torres mentioned at least three other people nicknamed Chino. See id. at 3030-34. The Court did not permit Agent McGinty to testify further about Chino or the description Mr. Medina-Torres gave of Chino at the July 16, 1998 debriefing. See 4/10/00 Tr. at 2715-17, 2727-29; 4/11/00 Tr. at 3031-32.

Both the Court's recollection and the trial transcript confirm that defense counsel's questions during her cross-examination of Mr. Medina-Torres opened the door to perhaps the most damaging testimony against her client in the entire trial, testimony about the debriefings with the FBI and the DEA -- a subject that had *not* been raised by the prosecutor on direct examination. See 4/5/00 Tr. 2462-66. She asked specific questions about Mr. Medina-Torres's conversations with Agent McGinty, established that Agent McGinty carefully took notes

34

during debriefings and then elicited testimony that Mr. Medina-Torres mentioned "El Chino" or "Chino" to the Agent -- all matters first introduced by defense counsel on cross-examination. While Mr. Medina-Torres stated on cross-examination that he did not mention Mr. Marquez's offer to sell 62 grams of cocaine at the Mamasan meetings to the "agents," the response elicited was not the result of skillful cross-examination, but rather defense counsel's attempt to explore areas in a manner that either mischaracterized the facts, confused the issue, or both. Before she asked if the witness remembered being "debriefed by the agents on March 8th and March 18th" -- which turned out to be the DEA debriefings -- she had asked a series of questions about the FBI and Agent McGinty. 4/4/00 Tr. at 2379. By shifting the focus of her questions from the FBI debriefings to those with the DEA without making it clear she was doing so, she created the potential for confusion, opening the door to the government's damaging clarification on redirect examination.[8] Moreover, by mentioning the specific dates, March 8 and March 18 -- dates of DEA, not FBI, debriefings -- she opened the door to the government's redirect examination which explored the details of those DEA debriefings. It is difficult to imagine a more deficient and incompetent performance.

In addition, defense counsel's questions on her cross-examination of Mr. Medina-Torres set the stage for admitting testimony from Agent McGinty about the July 16, 1998 debriefing. The prosecutor properly argued that such testimony now had to be admitted in order to counter defense counsel's effort to suggest -- and presumably argue to the jury -- that Mr.

---

[8] Because of the way defense counsel muddied the waters, when Mr. Medina-Torres answered that he had not mentioned anything about the 62 grams of cocaine to "agents," it is quite possible that he was testifying truthfully -- namely, that he did not mention the 62 grams of cocaine *to Agent McGinty*.

35

Medina-Torres's testimony was recent fabrication. The Court agreed that defense counsel had opened the door to testimony from Agent McGinty that Mr. Medina-Torres mentioned someone named Chino to him as far back as July 16, 1998, stating:

> And it [the proffered McGinty testimony] would take away the fabrication question, as [sic] least as far as it goes. In other words, it would help -- it would make it much more difficult for [defense counsel] to argue that the first time that Medina-Torrez [sic] mentioned Chino was here in Court or after his plea bargain was negotiated in connection with it. He mentioned Chino on 7-16-98.

4/10/00 Tr. at 2715-16; see also 4/11/00 Tr. 3028-29. While the Court limited the scope of the examination, Agent McGinty's testimony corroborated the otherwise easily discredited testimony given by Mr. Medina-Torres several days earlier.

The government argues that defense counsel's strategy with respect to her cross-examination of Mr. Medina-Torres seemed reasonable at the time and so it cannot be constitutionally ineffective: The witness's main vulnerability was his marginal credibility, and defense counsel engaged in the reasonable strategy of attacking this weakness. She also made the strategic judgment to ask questions about his prior debriefings with law enforcement officials to establish that his testimony to the jury was a recent fabrication. The Court agrees that Mr. Medina-Torres had serious credibility problems as a witness and so an argument that his testimony was a recent fabrication because he never mentioned Mr. Marquez or the two meetings at Mamasan's in debriefings with law enforcement agents would have been highly effective -- in an appropriate case. Defense counsel's questions on cross-examination were not reasonable in the circumstances of this case, however, because the attempt to establish a recent fabrication defense was doomed to failure, as defense counsel should have known from the discovery she

36

received before trial. Her lack of success in establishing any basis for arguing recent fabrication to the jury was predictable and her failed effort opened the door to damaging testimony on redirect examination of Mr. Medina-Torres and on Agent McGinty's direct examination. Hers were not reasonable errors made in the pursuit of sound trial strategy, but errors of constitutional dimension.

Based on the discovery produced to defense counsel by the government in advance of trial, defense counsel knew -- if she had read the documents provided to her -- or certainly should have known about the debriefings with both the FBI and the DEA and the statements Mr. Medina-Torres had made about her client before she ever began her cross-examination. See 4/18/00 Tr. 3386-88, 3390-93.[9] She should have known -- and in fact, did know -- that some people knew her client, or referred to him, not by his given name but as "Chino" or "El Chino," that Mr. Medina-Torres met with or spoke with Agent McGinty "on at least eight separate occasions," and that he mentioned someone named Chino to Agent McGinty. 4/4/00 Tr. at 2378. The fact that she specifically asked Mr. Medina-Torres questions about a March 8 and a March 18 debriefing demonstrates that she knew about these specific debriefings with DEA agents, that she possessed the reports written by the agents concerning the debriefings on those dates, and that she therefore should have known that Mr. Medina-Torres had identified Mr. Marquez as "El Chino" after viewing a photo spread. She also knew that Mr. Medina-Torres

---

[9]      In addition to the normal Rule 16 and Brady requirements, the Court, by order of November 9, 1999, required the government to deliver to defense counsel *a full ten days* before opening statements a list of witnesses and "all Jencks Act or Brady material not previously provided pertaining to each witness on the list."

told law enforcement agents that the person whose photograph he identified was the person with whom he had discussed the purchase of powder cocaine at Mamasan's -- Mr. Marquez.

If defense counsel had asked questions of Mr. Medina-Torres about the various debriefings with the FBI and the DEA without having any knowledge about these conversations in advance, that would have been bad enough -- perhaps below an objective standard of reasonableness -- because it would have violated the cardinal rule of cross-examination: Never ask a question -- let alone a damaging series of questions -- to which you do not know the answer -- in this case with devastating consequences. Her actions, however, were much worse; she asked questions when she knew or -- with proper preparation -- should have known that the answers would be harmful to her client. She possessed the relevant documents concerning the Medina-Torres debriefings with the FBI and the DEA that would have allowed competent counsel to conclude that recent fabrication was not the argument to make, but she nevertheless asked questions about matters that so obviously should have been off-limits. Either she entered into hazardous terrain fully aware of but choosing to ignore the pitfalls that might befall her client or did so after failing to read the documents turned over by the government that would have alerted her to the dangers ahead. See United States ex rel. Williams v. Brown, 721 F.2d at 1120. The Court need not resolve whether these actions resulted from a lack of foresight or an inexplicable failure to prepare; either explanation falls well below any objective standard of reasonableness. See Moore v. Johnson, 194 F.3d at 611-12; Ward v. United States, 995 F.2d at 1322.

The government tries to argue that no prejudice flowed from defense counsel's errors and that at most her mistakes had only a *de minimis* impact. To the contrary, defense

38

counsel's cross-examination significantly prejudiced her client. If defense counsel had simply sat down after attacking Mr. Medina-Torres's credibility, she could have argued quite effectively that Mr. Medina-Torres was a man who could not be believed. Here was an individual who had shown in the past his willingness to lie to and bribe law enforcement officials especially to save his own neck, who was facing an extremely long period of incarceration if convicted of the charges against him, and who therefore had both the propensity to lie and a motivation to do so. He was an individual who had engaged in an array of unsavory criminal activities -- drug dealing, prostitution, and bribing police officers. Moreover, no one heard the two conversations he said took place between him and Mr. Marquez at Mamasan's and no other witness could corroborate his story. By opening the door on cross-examination to testimony about debriefings with the FBI and the DEA that established both that Mr. Medina-Torres previously had identified Mr. Marquez and previously had told government agents about his offers to sell powder cocaine -- the same things Mr. Medina-Torres now was telling the jury -- defense counsel substantially enhanced the witness's credibility, thus undermining the very strategy on which her entire cross-examination had focused to that point. Defense counsel's errors enabled the government to introduce testimony from Mr. Medina-Torres and from Agent McGinty that allowed the jury to infer that while Mr. Medina-Torres may be untrustworthy, his testimony about Mr. Marquez was truthful.

Before her cross-examination, defense counsel could have argued that nothing Mr. Medina-Torres said could be believed and that the jury should disregard his testimony about the alleged meetings at Mamasan's, the only evidence in the course of an eight-week trial that directly tied Mr. Marquez to the conspiracy. As a result of her cross-examination, however,

39

defense counsel was unable to argue recent fabrication, and her credibility argument -- once so promising -- lost any impact it might have had. Moreover, Agent McGinty's testimony corroborated and gave the Medina-Torres testimony additional force. Because the debriefing he described in his testimony took place on July 16, 1998, the jury had evidence from which it might conclude that Mr. Marquez had participated in the conspiracy from early in the life of the conspiracy. Whatever limited value Mr. Medina-Torres's testimony may have had to the government before defense counsel's cross-examination, the testimony became incredibly damaging because of counsel's errors -- errors that would have been easily avoided by competent counsel.

### D. *Presentation of the Defense Case*

The presentation by defense counsel of Mr. Marquez's defense illustrates an appalling lack of preparation and skill that further demonstrates that she did not provide him with the constitutionally effective assistance of counsel to which he was entitled. On April 20, 2000, just before defense counsel was supposed to start presenting Mr. Marquez's defense, she brought to the Court's attention -- for the first time -- a statement or "affidavit" written by co-defendant Jose Diplan after the conclusion of the conspiracy while he and Mr. Marquez were incarcerated at the D.C. Jail and where Mr. Diplan spoke to Mr Marquez. See 4/20/00 Tr. at 3650, 3653-54. According to trial counsel, this statement supported Mr. Marquez's assertion that when he drove the blue Oldsmobile from the pool hall on February 4, 1999, he was unaware that heroin was hidden in the car. In the written statement, Mr. Diplan stated that Mr. Agramonte had told him (Mr. Diplan) that he (Mr. Agramonte) originally was going to pay someone else to drive the car

40

from the pool hall to the apartment -- and that the car belonged to Mr. Agramonte (which Mr. Agramonte had denied when he was on the witness stand, see 4/19/00 Tr. at 3582) -- but when that person was unavailable Mr. Marquez offered to drive the car instead. See id. at 3654-55. According to Mr. Diplan's statement, Mr. Agramonte accepted Mr. Marquez's offer and instructed him to leave the keys in the grass near the apartment building after he exited the car. See id. at 3655.

Although trial counsel believed this statement to be critically important to her client's defense, she was unprepared to offer the Court any theory as to how this hearsay statement of a non-testifying defendant could be admitted. She failed to ask Mr. Agramonte any question about the substance of the statement when he testified a short while earlier, and her only explanation for this failure was that she decided instead "to get the affidavit in through Mr. Marquez." 4/20/00 Tr. at 3653. Surely, she would have had a good faith factual basis to ask Mr. Agramonte about Mr. Diplan's statement and could have at least planted in the jurors' minds a question -- perhaps a reasonable doubt -- about Mr. Marquez's knowledge of the drugs, even if she could pursue the matter no further. Instead, defense counsel explained that she hoped that Mr. Diplan would testify so that she could introduce the statement through him -- even though Mr. Diplan's attorney had stated before the trial, during trial and several days earlier that his client would not be taking the stand. See id. at 3653. Still, trial counsel "felt the testimony would be much more credible . . . if it came from Mr. Diplan." Id. at 3655.

Defense counsel then suggested that she could call Mr. Marquez to the witness stand for the purpose of authenticating the document as a statement he had received from Mr. Diplan, provided that the Court agreed to limit the government's cross-examination to the

41

circumscribed scope of her direct examination. This proposal raised two problems: (1) under what theory could the hearsay statement be admitted, and (2) could the Court confine the government's cross-examination to the narrow scope of direct. It was clear to the Court that counsel had not thought about what hearsay exception could be invoked to support the admissibility of the statement. She cited only the co-conspirator exception to the hearsay rule in support of her proposal, despite the fact that (1) her client insisted that he was not part of the conspiracy, and (2) the statement was made by Mr. Diplan in jail after the conspiracy had ended and therefore could not be considered a statement in furtherance of the conspiracy.[10] With respect to the question of whether the Court could limit the scope of the government's cross-examination, trial counsel was equally unprepared to provide arguments in support of her position and she could not cite any case to support her argument. See id. at 3656-58.

Trial counsel said that she thought the Diplan statement was critical to her defense of Mr. Marquez, and it probably would have been helpful. She was aware of the existence of the statement for much of the eight-week trial; yet she waited until the day she was supposed to put on her client's defense to raise the issue with the Court because she was "trying to convince co-counsel to allow Mr. Diplan to testify." 4/20/00 Tr. at 3658. Despite the importance of the statement and the potentially difficult legal issues that would need to be decided prior to its admission, defense counsel failed to file any brief, cite any case or provide the Court with any legal theory on which to admit the evidence. As the Court said at the time:

---

[10]     In addition to the government's objection on grounds of hearsay, counsel for Mr. Agramonte objected on Bruton grounds to the admission of a statement purportedly made by his client to Mr. Diplan when he would be deprived of the opportunity to cross-examine Mr. Diplan. See 4/20/00 Tr. at 3656; see also Bruton v. United States, 391 U.S. 123 (1968). Counsel for Mr. Diplan also objected. See 4/20/00 Tr. at 3656.

Well, the question is not what my decision is. The question is what the law is. Why didn't you file a brief? Why didn't you brief this question? This is not an easy question. What law supports the admission of this statement? Give me some cases. What law supports permitting him to testify on this limited area? Give me some cases. Why do you wait until the very last day for the defense and the second to the last day for any evidence in this case in a seven-week trial and raise two questions that you know you're likely to lose on unless you can give me some case law that supports it.

Mr. Bramson [Mr. Agramonte's attorney] is right, this is a Bruton question. Mr. Black is right, that a similar, I would not say identical, but a similar issue arose the other day with respect to whether or not . . . the cross-examination of Mr. Agramonte could be limited. And Mr. Bramson and Mr. Black provided some case law.

Id. at 3659. With the comment, "Well, I'm not going to do your legal research for you," the Court took a recess to give defense counsel time to research the matter. Id. at 3660. During the break, the Court itself found some legal authority on whether a defendant's testimony could be so limited, see id. at 3662-67, but Mr. Marquez's trial counsel had nothing to add on the issue after the recess and the matter was closed; her "most important" evidence was excluded. Id. at 3662; 3667.[11]

Trial counsel's conduct with respect to the Diplan statement is another example of her tendency to be unprepared and to operate without thinking through her trial strategy or developing the legal arguments necessary to support her position in advance. This error in some respects is even more egregious because it occurred during the defense case -- a matter within

---

[11] Given the possibility that Mr. Marquez himself might want to testify about this matter, the Court advised him of the Fifth Amendment privilege against self-incrimination and gave him time to think about it and discuss it with counsel over lunch. See 4/20/00 Tr. at 3668-70. Ultimately, he decided not to testify. See id. at 3673.

43

defense counsel's control -- rather than in the government's case when she was in a more reactive mode and was sometimes (at least in her view) taken by surprise. The way defense counsel handled the Diplan/Agramonte statement, purportedly her most important evidence, falls below any objective standard of reasonableness and was "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment. Strickland v. Washington, 466 U.S. t 687, see Government of the Virgin Islands v. Watherwax, 20 F.3d at 579. [12]

This same lack of preparation and inattention to strategy was in evidence during the direct examination of the two witnesses whom defense counsel called to testify on her client's behalf: Cecilia Galeas, Mr. Marquez's sister-in-law, and Susana Galeas, his mother-in-law. Although not fully reflected by the cold trial transcript, the Court's recollection is that trial counsel's appeared tentative and unsure of how to proceed and never seemed to have any overall sense of how the testimony of these two defense witnesses might benefit her client or what she was trying to accomplish through these witnesses. With the first witness, Cecilia Galeas, she actually asked this obviously sympathetic witness questions that did Mr. Marquez more harm than good. The bulk of the direct testimony focused on Mr. Marquez's and Ms. Galeas's social interactions with Mr. Agramonte and Mr. Henri Alberto. See 4/20/00 Tr. at 3684-87. While this testimony, in isolation, did not implicate Mr. Marquez in a criminal conspiracy, in the eyes of the

---

[12]     In her argument in support of Mr. Marquez's motion for judgment of acquittal, defense counsel revisited the testimony of Mr. Soto Canales. See 4/18/00 Tr. 3370-73. From her arguments, it appears that she just forgot -- despite argument on this issue spanning two days -- that all of Mr. Soto Canales's statements regarding Mr. Marquez eventually were admitted. See id. at 3371-72. Her apparent failure to review the transcripts concerning Mr. Soto Canales's testimony and even to bring the transcripts with her to Court -- "I unfortunately, Your Honor, left my transcripts at home. I don't have them here with me." -- provides yet another example of her lack of preparation and foresight in representing her client. Id.

jury the testimony strengthened the connection between Mr. Marquez and two of the conspiracy's alleged leaders. If helping the government to introduce harmful evidence through a poorly conceived cross-examination falls below an objective standard of reasonableness, then introducing damaging testimony through the defendant's own witness also must fall below this objective standard. Where there is so little evidence to implicate Mr. Marquez in the conspiracy to begin with, evidence demonstrating his association with known leaders of the conspiracy is particularly damaging.

This damaging testimony largely nullified helpful evidence provided by Mr. Marquez's second witness, his mother-in-law, Susana Galeas. She explained that the defendant worked in her grocery store located next to the billiard hall where many of the events charged in the conspiracy occurred. See 4/20/00 Tr. at 3697-99. Her testimony showed that the grocery store shared a common door with the El Pacifico pool hall such that patrons of the pool hall often came through the grocery store. See id. Although it could have been done more artfully, defense counsel's examination of this witness elicited testimony that could have helped support a defense that Mr. Marquez's association with these individuals was infrequent and coincidental to his employment at the store. Instead, the two defense witnesses worked at cross purposes. The testimony of the first witness undermined any helpful inferences that could have been drawn from the second witness's testimony.

### E. Defense Counsel's Errors In Context

Prior to trial, the government had stated on numerous occasions that even though the charged conspiracy began in the spring of 1998, the only evidence it might have of Mr.

45

Marquez's having joined the conspiracy would be his friendship with co-defendant Pedro Agramonte and his conduct on February 4, 1999, the day of his arrest, when he drove a blue Oldsmobile some hours after an aborted drug sale in which he was not involved. Indeed, a description of that incident was virtually the only mention of Mr. Marquez in the government's detailed opening statement. See 3/6/00 Tr. at 107-12. In describing the conspiracy, the prosecutor mentioned numerous individuals and events both in the District of Columbia and in Philadelphia leading up to February 4, 1999, but only once did he mention Mr. Marquez (as a friend of Mr. Agramonte's) until he discussed the events of February 4. See id. at 117-22, 126. Even in his description of the testimony he would offer through Mr. Soto Canales and Mr. Medina-Torres, the prosecutor never mentioned Mr. Marquez -- suggesting that the testimony from these witnesses later elicited by defense counsel or after she had opened the door to further inquiry by the prosecutor was an unexpected windfall for the government, dramatically effecting the outcome of the trial. See id. at 132-35.

The trial in this case took eight weeks with the government calling 42 witnesses to testify in its case-in-chief. Yet, there was very little evidence introduced against Mr. Marquez, and it almost all related to the events of February 4, 1999. Several DEA agents testified about defendant Marquez's activities on that day, but neither they nor anyone else testified that Mr. Marquez did anything with respect to the aborted drug sale except drive a blue Oldsmobile from the El Pacifico pool hall to an alley near an apartment building several hours after the transaction was called off by co-conspirator Pedro Agramonte. The government's case against Mr. Marquez on the two substantive counts arising from these events was thin, and so it was not surprising that the jury decided to acquit him on both of those counts.

46

The evidence introduced by the government against Mr. Marquez on the conspiracy charge in its case-in-chief was even thinner in the Court's view; in fact, the government produced almost no evidence to suggest Mr. Marquez's involvement in the conspiracy. The conspiracy purportedly lasted from the spring of 1998 until February 4 or February 9, 1999.[13] Over the first several weeks of trial the government introduced detailed testimony describing the activities of Roger Ramirez, Henri Alberto, Jose Ismael Medina-Torres, Juan Zavala, Bertilio Soto Canales, Miguel Romero and Pedro Agramonte in the many drug transactions conducted over the course of the conspiracy. The jury viewed numerous video tapes depicting seven drug transactions that took place during that period, involving Roger Ramirez and Jose Ismael Medina-Torres -- two of the government's prime witnesses. Despite all of the evidence presented regarding these drug sales and the conspiracy of which they were a part, Mr. Marquez simply was never implicated in these events by any of his supposed co-conspirators or by any other witness. No one said Mr. Marquez was involved in any of these drug sales, including the sale on February 4, 1999, or in any of the trips taken by Henri Alberto, Antonio Alberto, Pedro Agramonte and Jose Ismael Medina-Torres to Philadelphia to transport kilogram quantities of drugs back to Washington, D.C. Nor was Mr. Marquez captured on any of the many video tapes introduced in evidence at trial. For weeks on end, Mr. Marquez simply was not mentioned in the trial of this case.

The only testimony to implicate Mr. Marquez in the conspiracy came from Mr. Soto Canales and Mr. Medina-Torres, and even they said nothing on direct examination to

---

[13]  The indictment alleges that the conspiracy did not end until February 9, 1999 because defendant Antonio Alberto was not arrested until that day, but Mr. Marquez was arrested on February 4, the day of the final, aborted drug transaction.

47

establish clearly Mr. Marquez's participation in the conspiracy. Both testified about isolated events; Mr. Soto Canales's testimony described a single drug transaction which he did not personally witness, and Mr. Medina-Torres's testimony described two conversations in which Mr. Marquez offered to sell drugs belonging to Henri Alberto, but no drugs and no money ever changed hands. In fact, neither of the witnesses testified that they ever personally saw Mr. Marquez with any type of drug, and their accounts of Mr. Marquez's activities were vague and often confusing. This evidence, taken in the light most favorable to the government, barely implicated Mr. Marquez in any sort of illegal activity and did little to show that Mr. Marquez was a member of the charged conspiracy.

The government had an uphill battle to convict Mr. Marquez on the charged conspiracy as both of these witnesses had substantial credibility problems. Mr. Soto Canales was impeached by the government with his own prior sworn testimony that he recanted and then contradicted with trial testimony that was less damaging to Mr. Marquez -- in effect admitting that he testified untruthfully before the grand jury. Mr. Medina-Torres's credibility problems were even more serious. Here was a man who was a paid informant for the FBI, who lied to the FBI about his drug dealing while working as an informant, and who worked as a pimp. Each man faced a long prison term, giving him an incentive to invent testimony that would enable him to receive a significantly reduced sentence, and each had demonstrated a willingness to lie in the past. On their direct examination these witnesses did not provide testimony that would support a finding beyond a reasonable doubt that Mr. Marquez was involved in a narcotics conspiracy.

Under these circumstances, the best and most prudent trial strategy for Mr. Marquez's lawyer was to keep a low profile and try to minimize the impact of the limited amount

48

of inculpatory testimony directed toward her client. Anytime she raised an objection or asked a question on cross-examination, the circumstances demanded that she exercise great care and restraint so that the government would not be allowed to introduce additional evidence to strengthen a weak case. Instead, defense counsel made decisions and stumbled into situations throughout the trial that courted disaster and clearly fell outside the range of professional competence that the Constitution demands. She raised overly aggressive objections without considering how her actions might influence the testimony, asked ill-conceived questions on cross-examination that elicited answers inculpating her client and/or opening the door to damaging testimony on redirect examination. Defense counsel's failings were not the result of reasonable strategic decisions; they were the result of her lack of foresight, her failure to prepare, and insufficient skill and the necessary judgment to consider the likely impact of her actions. She raised objections and asked questions without thinking about the consequences, ignored the helpful comments of the Court, and failed to take the basic step of reviewing discovery materials turned over by the government. The Court is forced to conclude that had Mr. Marquez proceeded at trial without any legal representation -- no one to object to questions asked by the prosecutors and no one to cross-examine government witnesses -- he would have stood a better chance of acquittal.

Defense counsel through cross-examination accomplished what the government was unable to do in its direct examination of Mr. Soto Canales and Mr. Medina-Torres -- namely, bolster the sagging credibility of each of these key witnesses and fill gaps in the government's case. Before defense counsel's inadvertent help, the government had little evidence against Mr. Marquez on the conspiracy charge, and the sources of that evidence would have lacked

49

credibility in the minds of the jury. Mr. Marquez's own lawyer altered the landscape, allowing the government to present additional and more damaging evidence against her client and to effectively rehabilitate the credibility of the two witnesses against him on the conspiracy count. Having sat through the eight-week trial and having observed defense counsel's conduct first-hand during trial, the Court can have no confidence in the reliability of the verdict and must conclude that but for defense counsel's errors, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. at 686-87; 690; see Moore v. Johnson, 194 F.3d at 612; Ward v. United States, 995 F.2d at 1322.

In an eight week long narcotics conspiracy trial involving three defendants, over three dozen witnesses, many of whom only spoke Spanish, and a complicated set of facts, even the most accomplished criminal defense attorney will make mistakes in the pursuit of a reasonable trial strategy. That is not this case. The Sixth Amendment does not guarantee the right to have mistake-free counsel, but it does provide that when an individual is faced with a significant deprivation of his liberty, he will have the assistance of an effective and reasonably competent lawyer. Defense counsel's actions in this case were not those of reasonably competent counsel but rather of a lawyer who failed to prepare, to think through arguments and to consider how her questions and objections might harm her client -- actions that directly led to her client's conviction. If the right to effective assistance of counsel has any meaning, then such actions must fall outside of what the Constitution demands. Mr. Marquez is entitled to a new trial.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: August 3, 2001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
UNITED STATES OF AMERICA,              )
                                       )
        v.                             )          Criminal No. 99-0043 (PLF)
                                       )
JOSE MARQUEZ,                          )
                                       )
            Defendant.                 )
_____)


                              ORDER

        For the reasons set forth in this Court's Opinion issued this same day, it is hereby

        ORDERED that the motion of defendant Jose Marquez for a new trial on grounds

of ineffective assistance of counsel pursuant to Rule 33 of the Federal Rules of Criminal

Procedure is GRANTED; and it is

        FURTHER ORDERED that a status conference in this matter is scheduled for

September 26, 2001 at 9:00 a.m.

        SO ORDERED.




                              /s/_____
                              PAUL L. FRIEDMAN
                              United States District Judge


DATE:  August 3, 2001